[No. F017904. Fifth Dist. Dec. 8, 1994.]

CHARLES M. DRAKE et al., Plaintiffs and Appellants, v.
D. W. MARTIN et al., Defendants and Respondents.

COUNSEL

Arthur C. Kralowec for Plaintiffs and Appellants.

Richard Christensen, Heusdens & Williams and James Heusdens for Defendants and Respondents.

OPINION

**STONE (W. A.), Acting P. J.**—Here we face two primary questions: (1) the remedy available to subsequent purchasers when a prior land sale transaction to which they were not parties violates the Subdivided Lands Act (Bus. & Prod. Code, § 11000 et seq.), and (2) the subsequent purchasers' rights pursuant to a release clause contained in a blanket deed of trust which the original parties did not perform.

This is the second appeal in this case. The previous appeal resulted in a reversal with directions to the trial court to consider further evidence and to make factual findings regarding the applicability of the Subdivided Lands Act and the continuing validity of the release clause. On remand, the court concluded the Subdivided Lands Act applied and had been violated, but that plaintiffs had no standing to declare the purchase void. The trial court also concluded the release clause was rendered a nullity and rights thereunder waived.

SUMMARY OF FACTS

I. *Facts Established at First Trial*

In 1979, J. Craig Holworthy, Land and Development, Inc. (Holworthy) purchased land located in Porterville from defendants, D. W. Martin and Loren and Betty McDonald, for $300,000. Holworthy paid $50,000 as a down payment and the $250,000 balance was represented by two promissory notes, one payable to Martin and one payable to the McDonalds. The notes were secured by a single deed of trust in favor of defendants. Exhibit "B" to the deed of trust contained a "release clause" which provided: "By acceptance of this deed of trust and the note[1] secured thereby, the Beneficiary authorizes and instructs the trustee herein named, provided no Notice of Default and Election to Sell then is a matter of record, to issue and record a partial reconveyance of the South half of said property upon payment to the Beneficiary of 80% of the unpaid principle [*sic*] balance of said note; and to

---

[1]Although there were two notes, the release clause uses "note" in the singular. The parties treat the two notes as one for the purpose of interpreting the release clause.

issue and record a partial reconveyance of the North half of said property upon payment to the Beneficiary of 30% of the unpaid principle [*sic*] balance of said note."

Although the release clause suggests the property consists of two equal parcels, it is difficult to determine how the property was divided because of its odd configuration. At no point in the record are the "North half" and the "South half" defined or described. The southern boundary borders Henderson Avenue which renders the southern portion of the property of more commercial value than the northern portion. Despite reference to two parcels in the deed of trust and release clause, there was evidence the property was divided into as many as five parcels at the time of Holworthy's purchase. Appendix "A," illustration No. 1, depicts the entire purchase and the five parcels.

After the purchase, Holworthy subdivided the property into three parcels, one in the north and two in the south. He sold the southeastern parcel to Golden Corral for $150,000 cash. Appendix "A," illustration No. 2, depicts the portion sold to Golden Corral. From those proceeds he paid $80,000 toward the note, with $66,875.84 credited against the unpaid principal balance and $13,124.16 for accrued interest. The portion of the payment attributable to principal was approximately $8,000 less than 30 percent ($75,000) of the unpaid principal balance of $250,000 which was necessary to trigger partial reconveyance of the north half of the property under the terms of the release clause.

Holworthy negotiated a separate agreement with defendants for release and reconveyance of the southeastern parcel from the lien in order to transfer free and clear title to the Golden Corral purchasers. Thereafter, Holworthy again subdivided the property into three parcels—one in the south, just west of the Golden Corral parcel, one extending across the middle of the property and one in the northern portion. Appendix "B," illustration No. 3, depicts these parcels.

In 1981 Holworthy sold the southwestern parcel (parcel No. 1, illus. No. 3) to plaintiffs for $140,000. Plaintiffs paid $70,000 as a down payment and the balance was represented by a promissory note for $100,000. Holworthy did not negotiate for release of plaintiffs' parcel from defendants' lien.

In 1982 Holworthy made two additional payments to defendants totaling $28,185.05 toward the unpaid principal balance on the note. When combined with the previous payment of $66,875.84, the total payment toward the unpaid principal balance exceeded 30 percent. In 1983 Holworthy defaulted

on the note and defendants recorded a notice of default claiming Holworthy was approximately $40,000 in arrears. When plaintiffs discovered Holworthy would be unable to cure the default, plaintiffs did so, and in exchange, Holworthy conveyed to them his interest in the two northern parcels (parcel Nos. 2 and 3, illus. No. 3) that remained encumbered by defendants' lien. At that point plaintiffs owned all of the property which remained subject to defendants' lien.

In 1984 plaintiffs defaulted on the note and defendants recorded another notice of default claiming approximately $136,000 in arrears. When plaintiffs failed to cure the default, foreclosure proceedings commenced. Defendants purchased the property at the foreclosure sale.

Plaintiffs filed a complaint in order to compel defendants to release from their lien the parcel they originally bought from Holworthy (parcel No. 1, illus. No. 3). They claimed defendants failed to comply with the Subdivided Lands Act because there was no release provision in the "blanket" lien by which plaintiffs could obtain free and clear title to their parcel upon compliance with the terms and conditions of their purchase agreement with Holworthy. (Bus. & Prof. Code, § 11013.1.)[2] They also claimed damages for breach of fiduciary duty, negligence and fraud.

The trial court found the entire $150,000 cash purchase price Holworthy received for the Golden Corral property should have been credited against the debt owed by him to defendants. With this credit, the court determined, Holworthy was not in default at the time defendants commenced foreclosure proceedings. Therefore, the court held the foreclosure was wrongful and awarded damages to plaintiffs.

II. *The First Appeal*

Both parties appealed and claimed numerous instances of trial court error. Not all of the issues were resolved in the first appeal because key factual questions had not been addressed in the trial court. First, it had not been determined whether the Subdivided Lands Act applied. (See § 11000 et seq.) Of particular concern at that time was whether there had been a violation of section 11013.1, which provides: "It shall be unlawful, except as provided in Section 11013.2, for the owner, subdivider, or agent to sell or lease lots or parcels within a subdivision that is subject to a blanket encumbrance unless there exists in such blanket encumbrance or other supplementary agreement a provision, hereinafter referred to as a release clause, which by its terms

---

[2] All further statutory references are to the Business and Professions Code unless otherwise indicated.

shall unconditionally provide that the purchaser or lessee of a lot or parcel can obtain legal title or other interest contracted for, free and clear of such blanket encumbrance, upon compliance with the terms and conditions of the purchase or lease."

Because section 11013.1 applies only to land or lands which are divided or proposed to be divided for the purpose of sale or lease or financing into five or more lots or parcels (§ 11000, subd. (a)), the court needed to determine how the property had been divided and for what purpose. Finally, the court needed to resolve the question whether section 11013.1 had been violated.

This court gave the following directions: "If, upon further hearing, the trial court concludes that the Subdivided Lands Act gives relief to plaintiffs, plaintiffs will be required to elect whether they wish to waive any rights they have under the act and affirm their purchase, or treat the contract as void and pursue recision.[3]"

This court also held the trial court erred in finding the full cash value of the Golden Corral property should have been credited against the lien because Holworthy and defendants consented to the credit of only $66,875.84 against the principal balance. Therefore, with a loan credit of only $66,875.84, the note was in default and foreclosure proceedings were not unlawful.

This court also directed the trial court to determine whether defendants and Holworthy intended to modify or terminate the release clause when they negotiated the release of the Golden Corral parcel. If the terms of the release clause remained in effect, Holworthy, and plaintiffs thereafter, remained entitled to release and reconveyance of the northern portion upon payment of 30 percent of the unpaid principal balance prior to their default.

Finally, the record did not clearly indicate what Holworthy and defendants intended to constitute the "North half" of the property covered by the lien and release clause. If the trial court determined appellants were entitled to release and title to the "North half," the court was directed to determine the legal description of that parcel.

III. *The Second Trial*

Several experts testified regarding how the land was configured in 1979 when Holworthy purchased it from defendants. The evidence was conflicting, but the court concluded Holworthy in fact purchased *six* parcels from

---

[3]Although "recision" may appear to be a typographical error or a misspelling, it is correct, although rare. (Oxford English Dict. (2d ed.)) In this opinion, we use the more common spelling, "rescission."

defendants. It was undisputed Holworthy purchased the property with the intent to subdivide for sale. With respect to the Subdivided Lands Act the court concluded: "There is no question that defendants failed to generally comply with the Subdivided Lands Act when they conveyed the land in question to Holworthy in 1979. They gave none of the requisite notices nor made the requisite filings contemplated. They were unaware of any obligation on their part to do so."

However, plaintiffs had no right to declare the purchase void because they were not parties to the transaction between Holworthy and defendants, and Holworthy had not assigned to them any right of action to seek rescission. Furthermore, the Subdivided Lands Act did not extend the remedy of rescission to subsequent purchasers.

With regard to the release clause the court found Holworthy, and subsequently plaintiffs, waived any right they may have had to release of the "North half" because they never "demanded performance" of its terms prior to defaulting on the note. Such a demand was an "implied condition precedent" to defendants' obligation to perform since they would have no way of knowing that the conditions for release of the "North half" had been met.

Although there was no direct evidence Holworthy and defendants intended to alter or modify the release clause, the court concluded the clause was rendered a nullity when Holworthy negotiated for the release of the Golden Corral parcel and thereafter reparceled the remaining land into three oddly shaped lots, only one of which was located in the more valuable southern half. "The only way in which defendants could have released from the trust deed a portion of the property and still retain a marketable and valuable security interest in the property would have been for Holworthy to have created parcels in conformity to the expectations shown [in the release clause.] This he did not do. In not so doing, and, in fact obtaining the partial release of the Golden Corral parcel from the lien, he should be deemed to have waived the benefit of the release provisions . . . . By creating the parcel he did and obtaining the release he did, Holworthy made it impossible for defendants to have adequate security in the remaining property if one-half of it were to be released from the trust lien. The property could not have been marketed in conformity to the expectations reflected in the release clause. . . ."

The trial court entered judgment in favor of defendants, and plaintiffs appeal.

## DISCUSSION

### I. *Noncompliance With Subdivided Lands Act*

The Subdivided Lands Act, an extensive set of rules by which the sale of subdivided lands is regulated, defines a subdivision as land which is divided or proposed to be divided into five or more parcels for the purpose of sale or lease. (§ 11000.) The act sets forth an elaborate reporting process and requires full and complete public disclosure of information regarding a subdivision offering. (See § 11000 et seq.) It also requires any blanket lien on a subdivision to include a release clause so that purchasers of lots or parcels within the subdivision can obtain title to their lots or parcels free of the blanket lien upon compliance with the terms and conditions of their purchase agreement. (§ 11013.1)

Noncompliance with the act renders the purchase agreement voidable, which means the purchaser has the right either to affirm the agreement and perform according to its terms or to declare the agreement void and recover the sums paid less any allowable offsets. (*Handeland* v. *Department of Real Estate* (1976) 58 Cal.App.3d 513, 518 [129 Cal.Rptr. 810]; *Barrett* v. *Hammer Builders, Inc.* (1961) 195 Cal.App.2d 305, 308-309 [16 Cal.Rptr. 49]; *Perkins* v. *Sommers* (1953) 117 Cal.App.2d 32, 34 [254 P.2d 913]; *Murphy* v. *San Gabriel Mfg. Co.* (1950) 99 Cal.App.2d 365, 368 [222 P.2d 85].) "Avoidance" of a contract is often called "disaffirmance." (1 Witkin, Summary of Cal. Law (9th ed. 1987) Contracts, § 5, p. 43.)

As we have noted, this court remanded with the foregoing remedy in mind: "If, upon further hearing, the trial court concludes that the Subdivided Lands Act gives relief to plaintiffs, plaintiffs will be required to elect whether they wish to waive any rights they have under the act and affirm *their purchase,* or treat the contract as void and pursue recision." (Italics added.)

However, as we will discuss, because plaintiffs' choice is to affirm or avoid "their purchase" they cannot obtain the remedy of rescission in the present action. Their purchase agreement was with Holworthy, not defendants, and Holworthy is not a named defendant in this action.

The trial court found the 1979 transaction between Holworthy and defendants to be in violation of the Subdivided Lands Act.[4] Indeed, nothing was done to comply with the act because "they were unaware of their obligation to do so." Holworthy apparently thought he was purchasing two parcels, in which case the act would not apply. The trial court found the land in fact was divided into six parcels at the time Holworthy purchased it from defendants. Holworthy admitted the land was purchased with the intent to subdivide. Holworthy and defendants did not realize the transaction violated the act until after Holworthy conveyed his interest in the property to plaintiffs. Holworthy testified that at no time did he intend to disaffirm the purchase. The question is whether plaintiffs can now disaffirm Holworthy's purchase, obtain rescission and unwind all subsequent transactions.

The trial court concluded: (1) the right to declare the transaction void vested solely in Holworthy as purchaser in the transaction; (2) because plaintiffs were not parties to the contract, they have no right to rescind; (3) Holworthy conveyed the property to plaintiffs, but did not convey or assign to them his right to bring an action to rescind the contract; (4) the Subdivided Lands Act does not provide the remedy of rescission to subsequent purchasers or successors in interest.

Plaintiffs claim the violation of the Subdivided Lands Act renders the transaction illegal and void; the lien arising out of the transaction is therefore also void and unenforceable. None of the cases cited by plaintiffs support the proposition that noncompliance with the act renders the purchase agreement void as opposed to voidable. *Barrett, supra,* holds noncompliance "renders the agreement of sale void," but then states that "void" in this context means the purchaser can elect either to affirm or disaffirm the agreement. (*Barrett* v. *Hammer Builders, Inc., supra,* 195 Cal.App.2d at pp. 308-309.)

Holworthy performed according to the terms of the purchase agreement until he could no longer make payments. He manifested no election to disaffirm or avoid the agreement. Defendants contend Holworthy's failure to disaffirm the agreement is binding on plaintiffs and they have no independent right to disaffirm. Plaintiffs contend their right to disaffirm the agreement flows from their position as "subsequent trustors in the chain of title," and they derive this right from their original purchase of a parcel from Holworthy as well as his subsequent conveyance of all of the property which remained subject to defendants' lien.

Plaintiffs rely upon authority pertaining to the rights of successors in interest when the original contract is void, i.e., a nullity. In *Kellogg* v. *Howes*

---

[4]Defendants claim the record does not support this finding. However, they have not appealed.

(1889) 81 Cal. 170 [22 P. 509], a statute declared failure to comply with its mandates rendered the contract "wholly void." (*Id.* at p. 173.) The court held a mechanic's lien based upon an underlying void contract was unenforceable. "A contract wholly void is void as to everybody whose rights would be affected by it if valid. . . ." (81 Cal. at p. 178.) Plaintiffs also cite *Durbin* v. *Hillman* (1920) 50 Cal.App. 377 [195 P. 274], in which the court explained the effect of a void contract but found the legal defect did not render the contract void. Likewise, in *Progressive etc. Bureau* v. *Whealton* (1944) 62 Cal.App.2d 873 [145 P.2d 912], appellant claimed the contract was "null and void" but the court found otherwise.

Because the purchase contract between Holworthy and defendants was voidable rather than void, plaintiffs' ability to rescind depends upon whether they have the power to disaffirm the contract at this late stage.

Plaintiffs claim they received the right to disaffirm the contract and rescind the sale as "an incident" to Holworthy's conveyance of the property to them when they cured his default. There is no specific assignment in the grant deed by which they obtained title to the property, nor is there a separate assignment. Nevertheless, plaintiffs claim it is a right "incident" to the conveyance.

They rely upon *National Pacific Oil Co.* v. *Watson* (1920) 184 Cal. 216 [193 P. 133], which involved successive assignments of a land sale contract which the seller never performed. The court held the assignment of the contract included the right to rescind the contract upon seller's failure to perform. (*Id.* at p. 220.) By contrast, in this case there was no assignment of a contractual right. Rather, this case involves the conveyance of title to real property by grant deed.

Plaintiffs also rely upon Civil Code section 1084, which provides in part, "[t]he transfer of a thing transfers also all its incidents, unless expressly excepted; . . . ." Plaintiffs contend the right to rescind the prior conveyance is an "incidental right" to the subsequent conveyance to them.

■ A grant deed transfers title to real property. (2 Miller & Starr, Cal. Real Estate (2d ed. 1989) § 6:4, p. 493.) The "incidents" which pass with title to real property are fixtures and appurtenances. (6 Miller & Starr, Cal. Real Estate, *supra*, § 19:30, pp. 578-582.) Easements, for example, are incidents which pass with the transfer of title to real property within the meaning of Civil Code section 1084. (*Tract Development Services, Inc.* v. *Kepler* (1988) 199 Cal.App.3d 1374, 1382-1383 [246 Cal.Rptr. 469].) ■ Plaintiffs cite no authority, and we know of none, holding the transfer

of title to real property also transfers rights the seller may have had under the land sale contract with his grantor.

Finally, plaintiffs argue the Subdivided Lands Act is intended to protect subsequent purchasers as well as the original purchaser. Therefore, subsequent purchasers must necessarily also have a right to rescind a prior transaction that was in violation of the act. The act itself contains no express language to this effect. Instead, plaintiffs claim the absence of language limiting the remedies available under the act implies the right to rescind extends to all purchasers. They cite language in the Subdivided Maps Act which expressly limits the remedy for noncompliance. A deed or conveyance which violates the Subdivided Maps Act is "voidable at the sole option of the grantee, buyer or person contracting to purchase, his heirs, personal representative, or trustee in insolvency or bankruptcy within one year after the date of discovery of the violation . . . ." (Gov. Code, § 66499.32, subd. (a).) The remedy of any "grantee, or his successor in interest, of real property" which has been divided in violation of the Subdivided Maps Act is an action for damages suffered as a result of the violation which must be brought within one year of its discovery. (Gov. Code, § 66499.32, subd. (b).)

From this language in the Subdivided Maps Act, plaintiffs argue the Legislature could have included the same limitation in the Subdivided Lands Act, and the failure to do so indicates an intention to extend to subsequent purchasers the same remedy available to the original purchaser of subdivided lands. According to plaintiffs, this broad remedy is consistent with the purpose of the act.

The legislative purpose of the Subdivided Lands Act is to protect individual members of the public who purchase lots or homes from subdivision developers. (*PJNR, Inc.* v. *Department of Real Estate* (1991) 230 Cal.App.3d 1176, 1183 [281 Cal.Rptr. 673].) Plaintiffs clearly are members of the protected class. Because Holworthy, the subdivision developer, never complied with the requirements of the act, plaintiffs clearly have the right to declare *their purchase* void and to recover the sums they paid to Holworthy less any allowable offset. (*Handeland* v. *Department of Real Estate, supra,* 58 Cal.App.3d 513, 518; *Barrett* v. *Hammer Builders, Inc., supra,* 195 Cal.App.2d 305, 308-309; *Perkins* v. *Sommers, supra,* 117 Cal.App.2d 32, 34; *Murphy* v. *San Gabriel Mfg. Co., supra,* 99 Cal.App.2d 365, 368.) They did not purchase from defendants and nothing in the act or case law interpreting the act suggests they should also have the right to rescind Holworthy's contract with defendants several years following his purchase.

*Murphy* v. *San Gabriel Mfg. Co., supra,* limits the remedy of rescission to executory contracts between purchaser and subdivider. " 'By the weight of

authority where money has been paid in consideration of an executory contract which is illegal, *the party who has paid it* may repudiate the agreement *at any time before it is executed* and reclaim the money. . . .' " (99 Cal.App.2d at pp. 368-369, italics added.) Although subsequent cases extend the remedy of rescission beyond the time it is executed, they limit the remedy to the original purchaser.

There are sound reasons to limit the right to rescind a land sale contract to the original parties. A hypothetical example illustrates our point: Suppose a developer purchases property and subdivides the land into 20 lots or parcels and sells all parcels to individual purchasers. One of the individual purchasers defaults on his note, but discovers the developer failed to comply with the Subdivided Lands Act when the developer purchased the property. To allow the individual purchaser to declare the developer's purchase null and void would jeopardize the other 19 conveyances that followed the original transaction.

Although not quite as dramatic as our hypothetical example, the facts before us pose the same problem. Golden Corral obtained title from Holworthy. If plaintiffs can declare Holworthy's title null and void, Golden Corral's title lacks finality.

Public policy favors stability of title to real property. (*Develop-Amatic Engineering* v. *Republic Mortgage Co.* (1970) 12 Cal.App.3d 143, 147-148 [91 Cal.Rptr. 193]; *Munger* v. *Moore* (1970) 11 Cal.App.3d 1, 9-10 [89 Cal.Rptr. 323]; *Kreisher* v. *Mobil Oil Corp.* (1988) 198 Cal.App.3d 389, 403-404 [243 Cal.Rptr. 662] ["[S]tability is at a premium" in the area of title to land.]; *Buehler* v. *Oregon-Washington Plywood Corp.* (1976) 17 Cal.3d 520, 531-532 [131 Cal.Rptr. 394, 551 P.2d 1226] [In the field of land titles "certainty and stability are the watchwords of an orderly society. . . ."].) To allow subsequent purchasers of lots in a subdivision to rescind the prior land sale contracts of their subdividers would create instability. The failure of the Subdivided Lands Act to provide the remedy plaintiffs now seek reflects sound public policy. A subsequent purchaser is not without a remedy, but the remedy is not rescission under the facts in this action.

II. *Waiver of Right to Performance of Release and Reconveyance Clause*

■ Plaintiffs assert the northern portion of the parcel purchased by Holworthy from defendants was automatically released from the blanket lien when 30 percent was paid toward the unpaid principal balance on defendants' note. They contend the "North half" should not have been included in

the foreclosure proceedings, and the foreclosure proceedings must be set aside and title to the "North half" conveyed to them.

Plaintiffs contend the trial court erred in concluding they were obligated to demand performance pursuant to the release clause in order to obtain the release of the "North half" of the property from the blanket lien. They rely upon language in Civil Code section 2941 which provides, when "any mortgage has been satisfied, the mortgagee . . . shall execute a certificate of the discharge . . . ." They claim this means the lien on the "North half" was "automatically extinguished" when 30 percent of the unpaid principal balance on the note was paid.

The security device at issue is a deed of trust—not a mortgage. With respect to deeds of trust, Civil Code section 2941, subdivision (b)(1) provides:

"When the obligation secured by any deed of trust has been satisfied, *the beneficiary* or the assignee of the beneficiary shall execute and deliver to the trustee the original note, deed of trust, request for a full reconveyance, and such other documents as may be necessary to reconvey, or cause to be reconveyed, the deed of trust." (Italics added.)

In this case, the obligation secured by the deed of trust was the promissory note to defendants. The deed of trust identifies Safeco Title Insurance Company (Safeco) as trustee, Holworthy as trustor, and defendants as beneficiaries. The release clause authorized Safeco to issue and record a partial reconveyance of the "South half" of the property upon payment of 80 percent of the unpaid principal balance and the "North half" upon payment of 30 percent of the unpaid principal balance.

Without some kind of notice that the obligation had been satisfied, Safeco would have no knowledge the release clause had been satisfied and it was therefore obligated to issue and record a partial reconveyance. Pursuant to Civil Code section 2941, defendants, as beneficiaries, were required to provide Safeco with proper notice.

However, plaintiffs' suggestion that defendants were compelled to request from Safeco a release and reconveyance to the "North half" even in the absence of a request or demand from Holworthy is not supported by the facts.

The release clause provides: "By acceptance of this deed of trust and the note secured thereby, the Beneficiary authorizes and instructs the trustee

herein named, provided no Notice of Default and Election to Sell then is a matter of record, to issue and record a partial reconveyance of the South half of said property upon payment to the Beneficiary of 80% of the unpaid principal balance of said note; and to issue and record a partial reconveyance of the North half of said property upon payment to the Beneficiary of 30% of the unpaid principal balance of said note."

According to the testimony of Holworthy and defendants, the purpose of the release clause was to protect defendants' security while allowing Holworthy to develop portions of the property without having to pay off the entire note. It was proposed by Holworthy's real estate agent. They first established a dollar value for the "South half" because of its greater marketability. The balance of the note was the dollar value placed on the "North half." The dollar value arrived at for the "South half" was 80 percent of the value of the property as a whole. However, in order to protect the value of the parcel that remained to the North, a payment of 30 percent was required for its release, for a total of 110 percent. The "unpaid principle [sic] balance" did not refer to the $250,000 balance at the time escrow closed—it referred to the balance at the time release was demanded. There was no contrary evidence regarding the meaning and effect of the release clause or the parties' intentions.

In 1980 Holworthy and defendants negotiated an agreement for partial reconveyance of title to the southeastern parcel so that Golden Corral could obtain title free and clear of the lien. They used the terms of the release clause to determine $80,000 was a fair price for the parcel. They did not think this agreement changed the terms of the release clause. Had Holworthy thereafter come to defendants at a future date with a payment of 30 percent of what was at that time the unpaid principal balance and asked for release of the "North half," they would have reconveyed that portion. However, because the configuration of the property had changed with the release of Golden Corral parcel, the "North half" and "South half" would need to be reparceled. Defendants assumed that just as Holworthy had come to them to request release of the Golden Corral parcel, he would ask for release of the next parcel to which he wanted title in order to develop, and they would arrive at a fair price based upon his request and the terms of the release clause. Holworthy never approached them with a payment and a request for release of the "North half."[5]

■ Unless a contract contains an unconditional promise to perform at a fixed time, a demand is "usually necessary" in order to give the promissor an

---

[5]Moreover, when Holworthy paid $80,000 to obtain release of the Golden Corral parcel, only $66,875.84 was paid on the unpaid principal balance of $250,000; the remaining

opportunity to perform and may be a condition precedent to the obligation to perform. (1 Witkin, Summary of Cal. Law (9th ed. 1987) Contracts, § 706, p. 641.) The record supports the trial court's conclusion that a demand for performance was an implied condition precedent to defendants' obligation to release the "North half."

There is no evidence Holworthy or defendants intended the release clause to result in an automatic release and partial reconveyance without a request or demand. To the contrary, both assumed the determination of when and what would be released depended entirely upon the nature of Holworthy's request. Plaintiffs cannot assume Holworthy's position and demand performance in a manner different from what Holworthy and defendants contemplated when they executed the release clause.

Plaintiffs challenge the trial court's finding that the failure to demand performance constitutes a waiver. According to plaintiffs, defendants never asserted waiver as an affirmative defense. Whether or not the failure to request release and reconveyance prior to default constitutes waiver or a failure of condition precedent, defendants' theory throughout the case has been that they never had an obligation to release anything more than the Golden Corral parcel. The court's findings are consistent with this defense. The "North half" remained subject to the lien and was not included erroneously in the foreclosure proceedings.

The trial court also concluded Holworthy caused the release clause to lose viability when he obtained release of the Golden Corral parcel, reparceled what remained into three parcels, and sold the remaining southern parcel to appellants. There were no longer northern and southern halves as contemplated in the release clause. The court found Holworthy destroyed the marketability of the property by his act of reparceling, thereby rendering the release clause a nullity. Plaintiffs do not challenge the trial court's factual findings in this regard.

Whether we construe Holworthy's actions as rendering the release clause a nullity, a waiver or the failure of a condition precedent to performance, plaintiffs are bound by the acts of their predecessor in interest. Otherwise, defendants are placed in the untenable position of being required to release and reconvey almost three-quarters of the property for a payment of less than 30 percent of the unpaid principal balance on the note. There is no evidence

---

$13,124.16 was an interest payment. This was a payment of only 27 percent of the unpaid principal balance—not enough to trigger release and reconveyance of title to the "North half." Although he subsequently made payments totaling $28,105.05, this also was not 30 percent of the unpaid principal balance and was not accompanied by a request for release.

Holworthy or defendants intended this result when they executed the release clause.

DISPOSITION

Judgment affirmed. Costs on appeal to respondents.

Vartabedian, J., and Thaxter, J., concurred.